FILED
SUPERIOR COURT
OF GUAM

2022 AUG 31 AM 11: 16

CLERK OF COURT

BY:_____

# IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| DAVID Q. MANILA,<br><br>Petitioner,<br><br>vs.<br><br>JOSEPH CARBULLIDO,<br>In his capacity as Director of Department<br>of Corrections,<br><br>Respondent. | Special Proceedings Case No. SP0185-19<br><br><br>**DECISION AND ORDER<br>DENYING PETITION FOR WRIT<br>OF HABEAS CORPUS** |

This matter came before the Honorable Dana A. Gutierrez on April 25, 2022 and May 2, 2022, for a hearing on Petitioner David Q. Manila's ("Petitioner") Petition for Writ of Habeas Corpus ("Petition"). Present at the hearing were Petitioner; Attorney Ana Maria Gayle, representing the Petitioner; and Assistant Attorney General Marianne Woloschuck, representing the Respondent Joseph Carbullido, in his capacity as Director of Department of Corrections ("Respondent"). After having considered the parties' written submissions, the arguments of counsel, the testimony of witnesses, and the applicable law, the Court now issues this Decision and Order **DENYING** the Petition.

## RELEVANT BACKGROUND

### I. Trial Court Proceedings in Criminal Case No. CF0020-08.

On January 12, 2008, the Guam Police Department ("GPD") discovered that the Blue

House, a karaoke bar in Upper Tumon, was a front for prostitution. *People v. Manila,* 2015 Guam 40 ¶ 2. It was discovered that the owner of the Blue House, Song Ja Cha ("Cha"), recruited young women from Chuuk to come work at the Blue House and that Cha offered customers commercial sex with these young women. Opening Br., at 1-6. The investigation grew to include three police officers employed by Guam Police Department ("GPD"), including the Petitioner, who were suspected of using their influence as law enforcement officers to keep Blue House employees from running away, or seeking help, and coercing them to continue in prostitution. *Manila,* 2015 Guam 40 ¶ 3.

In 2008, criminal charges were filed against Petitioner, and the case proceeded to trial in 2013. *Id.* Shortly before trial, Petitioner was charged, through a Fourth Superseding Indictment, with several counts of kidnapping, felonious restraint, and compelling and promoting prostitution, conspiracy, first degree and second degree criminal sexual conduct ("CSC"), and criminal intimidation and official misconduct. *Id.* at ¶ 4.

On September 19, 2013, a jury found the Petitioner guilty of the following offenses:

a.    First Charge-Conspiracy to Commit Kidnapping (As a 1st Degree Felony) (five counts);

b.    Second Charge-Kidnapping (As a 1st Degree Felony) (five counts);

c.    Third Charge-Conspiracy to Commit Felonious Restraint (As a 3rd Degree Felony) (five counts);

d.    Fourth Charge-Felonious Restraint (As a 3rd Degree Felony) (five counts);

e.    Fifth Charge-Conspiracy to Compel Prostitution (As a 3rd Degree Felony) (five counts);

f.    Sixth Charge-Compelling Prostitution (As a 3rd Degree Felony) (five counts);

g.    Seventh Charge-Conspiracy to Promote Prostitution (As a 3rd Degree Felony) (six counts);

h.    Eighth Charge-Promoting Prostitution (As a 3rd Degree Felony) (six counts);

i.    Tenth Charge-First Degree Criminal Sexual Conduct (As a 1st Degree Felony) (two counts);

j.    Eleventh Charge-Second Degree Criminal Sexual Conduct (As a 1st degree Felony) (two counts);

k.    Sixteenth Charge-Criminal Intimidation (As a Misdemeanor); and

l.    Seventeenth Charge-Official Misconduct (As a Misdemeanor).

Petitioner filed a Motion for a New Trial on December 16, 2013. *People v. Manila*, CF0020-08, Mot. For New Trial, (Dec. 16, 2013). In his Motion, Petitioner argued that a witness listed on one of the Government's Witness Lists, Ivory Waren ("Waren"), possessed relevant information to his defense. *Id.*

The trial court held that Waren's potential use as a defense witness was not "newly discovered evidence," and that Petitioner's trial counsel failed to call Waren due to a lack of diligence. *See People v. Manila*, CF0020-08, Decision and Order ("D&O") Defendant's Motion For New Trial (Mar. 31, 2014). In its D&O, the trial court reasoned that a new trial must not be granted because counsel's lack of diligence was evidenced by the fact that Waren was included in a witness list, and therefore, the defense had sufficient notice and opportunity to call her as a witness. *Id.* Therefore, the trial court denied Petitioner's motion for a new trial. *Id.* Ultimately, the trial court sentenced the Petitioner to a total of thirty (30) years imprisonment on April 14, 2014, and a Judgment was issued May 6, 2014.

## II.    First Appeal.

Petitioner appealed the 2014 Judgment and raised the issue of ineffective counsel. *People v. Manila*, 2015 Guam 40 ¶ 62-64 (*"Manila I"*). On December 31, 2015, the Guam Supreme Court issued its Opinion finding that the trial court did not commit an error of judgment in denying Petitioner's motion for a new trial because Petitioner admitted that he was aware of Waren's existence as a potential witness and chose not to subpoena her for strategic purposes. *Id.* at ¶ 64-67 (agreeing that the evidence was not newly discovered). The Guam Supreme Court vacated some of Manila's convictions, reversing sixty-three (63) of the original

eighty-two (82) charges and affirmed the remaining nineteen (19). *Id*. at ¶ 65, 66. However, the Guam Supreme Court elected not to address Petitioner's claim of ineffective counsel, noting that ineffective assistance of counsel claims are "more properly entertained in a collateral proceeding." *Id*. at ¶ 64, n. 5.

### III. Resentencing and Second Appeal.

On remand, despite the reduction in the number of convicted charges, the trial court re-sentenced Petitioner to thirty years, and Petitioner appealed. In *People v. Manila,* 2018 Guam 24 (*"Manila II"*), the Guam Supreme Court found that the trial court did not abuse its discretion in the sentencing and that it was within the statutory range for the charges. *Manila II*, 2018 Guam 24 ¶ 9-17.

### IV. Petition for Writ of Habeas Corpus.

The present Petition was filed on October 7, 2019, accompanied by a Motion to Proceed in Forma Pauperis (Oct. 7, 2019) and Motion for Appointment of Counsel (Oct. 2, 2019). Respondent filed his Answer to the Petition on December 6, 2019. The previously assigned judge in this matter granted Petitioner's Motion for Appointment of Counsel on June 15, 2020.

This matter was reassigned to the undersigned on January 15, 2021. On June 1, 2021, Petitioner filed his Opening Brief supported by the Declaration of Heather M. Zona ("Zona Declaration"). On July 15, 2021, Respondent filed his Brief in Opposition to Petition for Writ of Habeas Corpus ("Opposition"). On August 2, 2021, Petitioner filed his Reply. The Court initially scheduled the Petition Hearing for August 5, 2021, however, the hearing was rescheduled due to several requests for continuances and the filing of motions from the parties.[1]

The Court ultimately heard the Petition on April 25, 2022 and May 2, 2022. During the

---

[1] *See* Order Setting Petition Hearing Date (Jan. 24, 2022) and Decision and Order Re APD's Motion to Withdraw As Court-Appointed Counsel (Apr. 18, 2022) for more information regarding the continuances.

hearings, the Court heard testimony from Waren and Attorney Terence E. Timblin ("Attorney Timblin"), Petitioner's trial counsel in CF0020-08.[2] After hearing the testimony presented and the arguments of the parties, the Court took the matter under advisement.

## DISCUSSION

Title 8 GCA § 135.10 sets the standard for habeas corpus relief on Guam. A petitioner for a writ of habeas corpus is entitled to such relief if he can establish that he was unlawfully imprisoned or restrained of liberty. 8 GCA § 135.10. Petitioner in this matter argues that the trial court's finding that the trial counsel's conduct demonstrated a lack of diligence, constitutes a clear ineffective assistance of counsel claim. Mem. In Support of Petition for Writ of Habeas Corpus, at 6 (Oct. 7, 2019). Petitioner claims that not calling Waren to testify was an error so serious that it caused Petitioner to be sentenced to thirty (30) years in prison. *Id.* Petitioner claims that trial counsel's decision not to contact Waren was inadequate and unreasonable, especially when counsel was aware of Waren's existence and that trial counsel had every means at his disposal to contact Waren. Opening Br., at 9.

Respondent argues that Petitioner did not suffer ineffective assistance of counsel. Opp., at 8-10. Respondent emphasizes that the standard for ineffectiveness is not whether counsel in hindsight could have acted in a different manner but rather that the choices that defense counsel made at the time were in fact reasonable. *Id.* Respondent claims that trial counsel's decision to not call Waren to the stand was purely strategic, noting that parts of Waren's testimony contradicted Manila's defense. *Id.* at 10. Moreover, Respondent claims that even if Waren had testified at trial, her testimony would have not substantially changed the outcome of the trial.

---

[2] Petitioner executed a Waiver of Attorney-Client Confidentiality (the "Waiver") on April 29, 2022, knowingly and voluntarily waiving the attorney-client privilege with respect to the matters relevant to his claim of ineffective assistance of counsel.

*Id.* at 10-13.

## I.    Timeliness of the Petition.

Respondent argues that the Court should dismiss the Petition for untimeliness, citing *Ignacio v. People of Guam*, 2012 Guam 14. *Id.* at 6. However, the Court finds the present case significantly distinguishable from the facts in *Ignacio*.

In *Ignacio*, the Guam Supreme Court declined to adopt a statute of limitations for writs of habeas corpus, and instead held that the court should evaluate whether a significant delay in filing a petition for writ of habeas corpus is justified. *Ignacio*, 2012 Guam 14 ¶ 15. However, a key distinction between the present case and *Ignacio* is that in *Ignacio*, it was clear and undisputed that the delay in bringing the petition was indeed significant. *See id.* at ¶ 8. Thus, the *Ignacio* Court did not specifically address what might constitute a "significant delay." *Id.*

In light of the facts in *Ignacio*, this Court does not find that Petitioner significantly delayed the filing of the present Petition. In *Ignacio*, the defendant was sentenced to concurrent terms of life imprisonment in 1978, but did not begin pursuing his habeas claim until 2004 and did not formally file his petition until 2011. *Ignacio*, 2012 Guam 14 ¶ 3.

By contrast to the thirty-three year delay in *Ignacio*, Petitioner in this case filed his Petition within one year after his second appeal to the Guam Supreme Court was decided and within five years after the initial judgment was issued by the trial court. In *Manila I*, issued in 2015, the Guam Supreme Court remanded the case back to the trial court for resentencing, which was not affirmed by the Guam Supreme Court until the *Manila II* Opinion was issued in 2018.

Assuming *arguendo* that the 2015 *Manila I* Opinion put Petitioner on notice that he could seek collateral relief through a habeas petition, the outcome of Petitioner's second appeal

may have reasonably affected his decision on whether to pursue habeas relief. Furthermore, even if the 2015 *Manila I* Opinion should have prompted Petitioner to file his habeas petition, Petitioner still filed only four years later, on October 7, 2019. This four year delay is drastically different from the thirty-three year delay in *Ignacio*. In comparing these facts, the Court does not consider the delay in this case significant such that the Petition should be dismissed due to untimeliness.

## II.     Standard for Ineffective Assistance of Counsel Claims.

To bring a successful claim of ineffective assistance of counsel, a defendant must demonstrate two elements: "1) that counsel's performance was deficient and (2) that this deficiency prejudiced his or her defense." *People v. Quintanilla*, 1998 Guam 17 ¶ 8 (adopting the test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The benchmark for judging an ineffective assistance claim is whether counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *People v. Borja*, 2017 Guam 20 ¶ 15 (citing *Strickland*, 466 U.S. at 686).

In determining whether trial counsel's performance was deficient under the first prong of the *Strickland* test, a reviewing court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of the conduct." *Mendiola v. Ishisaki*, 2019 Guam 26 ¶ 13 (citing *People v. Leon Guerrero*, 2001 Guam 19 ¶ 11). When challenging a conviction based on a claim of ineffective assistance of counsel, a convicted defendant "must identify the acts or omissions of counsel that are alleged to be the result of unprofessional conduct." *Id.* (internal citations omitted). Here, Petitioner identifies the trial counsel's failure to investigate Waren as a witness and to call her as a witness during his trial as the ground for his claim of ineffective assistance of counsel. Opening Br., at 1-2.

**A.    Petitioner Satisfies Initial Hurdle of Showing Witness Availability, Content of Witness's Testimony, and That Her Testimony Would Have Been Favorable.**

The Guam Supreme Court has clarified that "[n]ot every decision to forgo calling a witness [ ] is tantamount to deficient representation." *Mendiola*, 2019 Guam 26 ¶ 14. To succeed on an ineffective assistance of counsel claim based on counsel's failure to call certain witnesses, a petitioner must show how the proposed witness's testimony would have been favorable and material. *Id.* Further, "the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Id.*

At the April 25, 2022 hearing, Waren testified that the two phone numbers included with her notes as part of the discovery provided to defense counsel were both her phone numbers. Min. Entry, at 11:34:50 AM (Apr. 25, 2022). Waren further testified that she has always stayed on Guam, yet Attorney Timblin never contacted her before Petitioner's trial. *Id.*

Based on Waren's testimony at the hearing on Petitioner's Motion for New Trial before the trial court, Petitioner identifies that Waren's testimony would have included the following:

1. That she had been living at her same house from 2012 through the trial; though one of her cell phones had stopped working, law enforcement investigators were able to reach her on her house phone.
2. That each night, at the Blue House, there was a meeting at which Waren translated for Cha to the women, from English into Chuukese.
3. That Cha told the women that no sex was allowed.
4. That Waren never heard and never translated to the women that if they were to leave they would be arrested.
5. That Waren saw Petitioner go into the VIP room with Weria, one of the named victims in the criminal case.
6. That Weria never claimed Petitioner forced her to have sex.
7. That a different named victim, Nemek, would have sex with customers even though Cha would get mad at her.
8. That Nemek never complained about any customer forcing her to have

sex, never complained about any police officer forcing her to have sex, and never complained she was not free to leave if she wanted to leave.

9.    That none of the women ever told Waren they were threatened by a police officer.

10.   That Weria and Nemek were lying about Cha locking them in the Blue House at night.

11.   That Cha did feed the women; Cha did not beat up any of the women; Cha would let the women use the phone; Cha would let the women visit their families.

12.   That at holiday parties at the Blue House, the women would invite their relatives, including parents.

Opening Br., at 4-5.

Petitioner argues that these statements would have contradicted the statements made by the prosecution's witnesses at trial. *Id.* at 5; Reply, at 2-5. Specifically, Petitioner asserts that these statements contradicted the prosecution's witnesses who claimed they were held against their will, forced to engage in prostitution, were threatened by Cha and Petitioner, and were the victims of non-consensual sexual contact by Petitioner. Opening Br., at 5. Petitioner explains that Waren's testimony would have been favorable to Petitioner because it would have gone to his defense that he never engaged in kidnapping, compelling prostitution, or criminal sexual conduct. Reply, at 3.

Based on Waren's testimony presented by Petitioner at the Petition Hearing and at the Motion for New Trial Hearing, and in light of Petitioner's explanation, the Court finds that Petitioner has satisfied his initial burden of demonstrating Waren's identity, that she was available to testify and would have done so, and that the content of her potential testimony would have been favorable to a particular defense. *Mendiola*, 2019 Guam 26 ¶ 14.

### B.    Despite Petitioner Meeting His Initial Hurdle, Counsel's Performance Was Not Deficient in Light of All the Circumstances.

However, once a Petitioner satisfies this "initial hurdle," the analysis does not stop there. *Mendiola*, 2019 Guam 26 ¶ 16, 24 (holding that counsel's conduct was not deficient despite

finding that petitioner satisfied the "initial hurdle" of demonstrating that the witness was available to testify, what she would have testified to, and that her testimony would have been favorable to the defense). Because of the strong presumption that counsel has rendered effective assistance, the Court must then consider whether counsel's assistance was reasonable in light of all the circumstances. *Id.* at ¶ 22.

These considerations may include determining whether weaknesses in the proposed witness's testimony were exposed at the hearing on the habeas petition, whether the witness's interactions with counsel—or lack thereof—indicated a lack of veracity, the extent of the counsel's trial experience, whether counsel consulted with the defendant about his decision, or the efforts made to interview the witness prior to trial. *Id.* at ¶ 16-24.

The *Strickland* Court specifically considered the standard for ineffective assistance of counsel based on a decision not to investigate potentially mitigating witnesses or evidence, noting:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689.

The *Strickland* Court elaborated on this high burden, holding that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. In other words,

"counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691, 699 (finding that counsel's strategy to rely on respondent's acceptance of responsibility was within the range of professionally reasonable judgments and the decision to forgo character or psychological evidence was reasonable).

The Guam Supreme Court has noted that "while in some instances even an isolated error can support an ineffective-assistance claim if it is sufficiently egregious and prejudicial, it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Mendiola*, 2019 Guam 26 ¶ 25 (internal citations omitted). With respect to the reasonableness of an attorney's investigation, a court must consider the "quantum of evidence already known to counsel[,]" and "whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

It may be reasonable for a trial counsel to decide not to interview a witness named by the prosecution where the discovery materials reflect the witness's likely answers, and the defense does not want the prosecution to learn of the defense's strategy. *U.S. v. Knight*, 975 F.Supp 119, 130 (D.D.C. 2013) (finding the defense's decision not to investigate certain witnesses to be a reasonable strategic decision).[3] In other words, "investigation of a defense may be curtailed or eliminated if the facts are already known to counsel through another source," including through

---

[3] Petitioner asserts that attorneys generally should not rely only on police investigation notes when deciding whether or not to pursue witnesses. Opening Br., at 9. However, Petitioner's brief does not cite legal support for this proposition, and when the Court asked if Petitioner had legal support for this assertion, Petitioner's counsel responded that she did not have any. Min. Entry, at 12:05:51-12:08:59 PM (May 2, 2022). As explained above, many courts have held that reliance on such documents may be reasonable under the circumstances.

conversations with the prosecution. *Ledezma v. State*, 626 N.W.2d 134, 145 (Iowa 2001) (citing *Mulligan v. Kemp*, 771 F.2d 1436, 1442-43 (11th Cir. 1985) (holding that trial counsel's conduct did not fall below the "reasonable substantial investigation" standard where trial counsel incorrectly assumed he knew the substance of witnesses' testimonies based on his conversations with the prosecution, and made no attempt to interview the witnesses)).

Although an attorney has a duty to consult with his client regarding the exercise or waiver of basic trial rights—whether to plead guilty, waive a jury, testify on his own behalf, or take an appeal—this obligation does not require counsel to obtain the defendant's consent to "every tactical decision." *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (citing *Taylor v. Illinois*, 484 U.S. 400, 417-18 (1988) (an attorney has authority to manage most aspects of the defense without obtaining his client's approval)).

## 1. Counsel's Conduct Was Not Unreasonable.

In the present case, Attorney Timblin testified that he was aware of Waren's potential as a witness from the discovery provided by the prosecution and because she was named on one of the prosecution's witness lists. Min. Entry, at 11:20:56 AM (May 2, 20221). Attorney Timblin testified that Petitioner admitted to having consensual sex with one of the named victims in his criminal case, but Waren's statement provided through discovery contradicted Petitioner's assertion that he never had sex with a different named victim, E.N. *Id.* at 11:21:38 AM. Attorney Timblin said that he was worried about that contradiction, so under all the circumstances, he decided it was best not to call her. *Id.*

The Court must evaluate whether this decision made by Attorney Timblin was reasonable in light of all the circumstances. *See Mendiola*, 2019 Guam 26 ¶ 22. In his underlying criminal case, Petitioner faced trial with his co-defendant, Anthony T. Quenga ("Quenga"). Quenga's trial

counsel was Attorney Sylvia L.G. Stake ("Attorney Stake"). Attorney Timblin testified that he was provided with roughly three thousand (3,000) pages of discovery. Min. Entry, at 11:18:02 AM (May 2, 2022). Because of the amount of discovery provided, Attorney Timblin and Attorney Stake split some work between them. *Id.* at 11:21:22 AM. Attorney Timblin testified that although he could not recall who did what, Attorney Stake told him that she attempted to locate Waren, but was unsuccessful. *Id.* Attorney Timblin explained that in addition to Waren's statement contradicting his client's position, the fact that they could not find Waren caused Attorney Timblin to make less of a "point to call her." *Id.* at 11:27:05 AM; *see Mendiola*, 2019 Guam 26 ¶ 18 (where the witness's repeated non-appearance at meetings gave rise to valid concerns about the witness's credibility).

Scrutiny of Attorney Timblin's conduct must not be made through the distorting lens of hindsight, and the Court begins with the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. In this case, there was a vast amount of pre-trial discovery provided to Attorney Timblin. Min. Entry, at 11:18:02 AM (May 2, 2022). The case was complex, with the trial lasting almost a month, including testimony from nearly twenty-five witnesses. *Id.* at 11:18:34 AM.

Attorney Timblin did not make zero efforts to investigate Waren, but rather relied on the co-defendant's counsel's representations that she made efforts to contact Waren and was unsuccessful. Further, Attorney Timblin considered Waren's statement provided to police investigators and determined that her statement contradicted Petitioner's assertion that he never had sex with E.N. The combination of Attorney Stake's inability to make contact with Waren and the contradiction of Waren's statement against the position of the Petitioner led Attorney Timblin to conclude that he should not pursue Waren as a potential witness.

Additionally, the Court must not view this isolated decision in a vacuum. Attorney Timblin is an experienced trial attorney who has practiced criminal law since 1977 and has conducted between 60-70 criminal trials. *Id.* at 11:14:14 AM. Attorney Timblin was highly successful in many respects throughout his representation of Petitioner due to his diligent legal work. Despite Attorney Timblin's decision not to further investigate Waren as a witness, Attorney Timblin was successful in overturning sixty-three (63) convictions of the original eighty-three (83) charges. *Id.* at 11:40:44 AM. Throughout his representation of Petitioner, Attorney Timblin filed at least ten substantive motions on behalf of his client, not including his representation of Petitioner during his two post-judgment appeals. *Id.* at 11:39:02 AM. Thus, in considering the above testimony and the circumstances of the case, Attorney Timblin's overall performance from the beginning of his legal representation to the end indicates active and capable advocacy and supports a finding that he did not act unreasonably.

## 2. Waren's Credibility Was Undermined by Respondents.

Petitioner claims that Attorney Timblin's decision not to call Waren was deficient because Waren was the only witness that could attest that workers at the Blue House were not kidnapped and that nobody was compelled to prostitution. Min. Entry, at 10:48:09 AM (Apr. 25, 2022). Respondent claims that this testimony from Waren was hardly the "smoking gun" that the Petitioner claims it to be, and even if offered at trial, Respondent asserts that Waren's testimony would have not made a difference in the outcome. *Id.* at 10:53:08 AM.

The Court agrees with Respondent's assertion that most of Waren's testimony is contradictory and lacks credibility. Waren testified that she would leave before closing time due to having small children at home and that she never stayed the night except once when she was

14

too intoxicated to drive. Min. Entry, at 11:43:54-11:48:08 AM (Apr. 25, 2022).[4] She claimed she would not arrive at the Blue House until around 6:00 p.m. every day, which she admitted would be after opening hours and after happy hour, making her unaware of anything that happened before 6:00 p.m. and after closing time–2:00 a.m. on weekdays and 4:00 a.m. on weekends—at the Blue House. *Id.* at 11:44:33 AM.

Waren admitted that even when present at the Blue House, there were severe limitations to what she could observe that might be able to disprove any of the other allegations submitted by the victims. *Id.* at 11:45:08-11:46:15 AM. She admitted there was poor visibility in several areas of the Blue House, particularly from the lounge to to the kitchen and from the kitchen to the VIP room. *Id.* In light of this testimony, it is clear that Waren did not possess information that could confirm or deny the victim's allegations of abuse that occurred outside of Waren's working hours or outside of Waren's sight during working hours at the Blue House.

Furthermore, although some of Waren's testimony would have contradicted the prosecution's witnesses, other parts of her testimony in fact corroborated several of the accusations made against Cha and Petitioner. Specifically, Waren admitted that while the women in the Blue House were sleeping, Cha would lock them in their sleeping room from the outside and that the women did not have a key. *Id.* at 11:48:29 AM. Waren clarified that only the women who had supervisor roles at the Blue House—Freida and Jackie—were permitted to invite their relatives to the parties hosted by Cha at the Blue House. *Id.* at 10:50:15 AM. Additionally, Waren confirmed that she knew that customers had sex in the VIP rooms because she caught one of the women—Lisa—having sex in a VIP room with a customer. *Id.* at

---

[4] Warren testified that on the weekdays, the Blue House closed at 2:00 a.m., so she would leave by about 1:00 a.m., and on weekends, the Blue House closed at 4:00 a.m., so she would leave by about 3:00 a.m. Min. Entry, at 11:42:50-11:46:45 AM (Apr. 25, 2022).

11:16:00-11:21:00 AM.

The victims that testified in this case included: M.C. (aka "Penny"); K.C. (aka "Klia" or "Tina"); E.N. (aka "Lisa"); D.R. (aka "Vivian"); S.S.; A.T.; F.E. (aka "Lynn"); L.P.; (aka "Lucy"); S.T. (aka "Syleen"); and N.T. (aka "Nana"). *Id.* at 11:40:50-11:42:50 AM. Waren testified that she was not familiar with the identity of some of the girls that testified at trial—particularly Penny, Vivian, Lucy and Nana. *Id.*

Also damaging to Waren's credibility is her claim that she talked to Cha at the end of 2011. *Id.* at 11:51:15 AM. Waren volunteered that she was contacted by Cha at some point in 2011 after she saw that Cha had been convicted on the news. *Id.* Waren claimed that Cha asked her to meet Cha at the Blue House where they sat together and discussed the events that had taken place. *Id.* This claim would have been impossible as Cha was in custody at the time and had not been released at any point before or after her conviction. Respondent's Mot. Judicial Notice, Exhibit A (May. 16, 2022).[5]

These inconsistencies call into question the reliability and credibility of Waren's overall testimony which weighs in favor of a finding that counsel's decision not to pursue Waren's testimony was a well-reasoned strategic choice. *Mendiola*, 2019 Guam 26 ¶ 16, 21 (considering that the prosecution was able to point out several inconsistencies in the proposed witness's testimony and finding that counsel's choice was strategic). While certain statements made by Waren may have contradicted the prosecution's witnesses, some of her statements would have either corroborated aspects of their testimony or would have contradicted Petitioner's version of

---

[5] At the May 2, 2022 Petition Hearing, Respondent moved the Court to take judicial notice of the fact that Cha was immediately remanded into custody after being found guilty in her criminal trial before the District Court of Guam, and that she was eventually sentenced to life imprisonment, without ever having been released after trial. Min. Entry, at 12:23:56 PM (May 2, 2022). In accordance with Rule 201 of the Guam Rules of Evidence ("GRE"), and based on Petitioner's non-opposition, the Court agreed to take judicial notice of such facts if Respondent provided the appropriate record to the Court. *Id.*

the events.

Although there are other avenues that Attorney Timblin could have pursued to secure Waren's appearance, or more he might have done to investigate her claims, this does not render his performance deficient under the circumstances. *See Mendiola*, 2019 Guam 26 ¶ 24 ("And while the court agrees with Mendiola that Attorney Moots could have exerted greater efforts considering what was at stake for Mendiola, we do not agree this conduct rises to the level of deficiency under *Strickland*."). In light of the explanation provided by Attorney Timblin, the testimony presented by Waren, and in considering all the circumstances, the Court finds that Attorney Timblin relied on police investigation notes, the efforts made by his co-counsel to locate Waren, and other discovery materials in order to make a reasonable strategic decision not to further investigate or call Waren as a potential witness based on the possibility that she would contradict Petitioner's version of the events that took place.

Therefore, Attorney Timblin's conduct does not rise to the level of deficiency required for a finding of ineffective assistance of counsel. As Petitioner failed to satisfy the first prong of *Strickland* because he failed to demonstrate that trial counsel's conduct fell below an objective standard of reasonableness under all the circumstances, the Court need not proceed to the second part of the *Strickland* analysis. *See Mendiola*, 2019 Guam 26 ¶ 27.

## CONCLUSION

For the foregoing reasons, the Court hereby **DENIES** Petitioner David Q. Manila's Petition for Writ of Habeas Corpus.

AUG 3 1 2022

**SO ORDERED:** _____

_____
**HONORABLE DANA A. GUTIÉRREZ**
Judge, Superior Court of Guam

17